**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| PERVACIO, INC., | Case No. 20-12096 (JTD) |
| Debtor. | **Re: D.I. 76**<br>**Hearing Date:  January 5, 2021 at 3:00 p.m. (EST)** |

**CITIBANK, N.A.'S OBJECTION TO MOTION OF THE**
**CHAPTER 7 TRUSTEE FOR ORDER APPROVING**
**SETTLEMENT WITH AND RELEASE OF PARTNERS FOR GROWTH V, L.P.**
**PURSUANT TO FED. R. BANKR. P. 9019 [D.I. 76]**

Citibank, N.A. ("Citibank"), by and through its counsel, hereby submits this objection (the "Objection") to the *Motion of the Chapter 7 Trustee for Order Approving Settlement with and Release of Partners for Growth V, L.P. Pursuant to Fed. R. Bankr. P. 9019* [Docket No. 76] (the "Settlement Motion"). In support of this Objection, Citibank respectfully states as follows:

**PRELIMINARY STATEMENT[1]**

1.        As part of the CARES Act,[2] the federal government funded the Paycheck Protection Program ("PPP") with $669 billion of taxpayer money intended to support American small businesses and jobs that were decimated by the COVID-19 pandemic and the ensuing economic collapse. The government's goal was to provide immediate, emergency relief. Unfortunately, despite the best efforts of both the government and lenders participating in the PPP program, the emergency nature of the program made it susceptible to fraud and abuse by unscrupulous actors. Through the Settlement Motion, the Trustee requests approval to settle all Estate claims and causes

---

[1]        Capitalized terms used but not defined in this Objection have the meaning ascribed to them in the Settlement Motion.  Certain capitalized terms used in the Preliminary Statement are defined later in this Objection.

[2]        15 U.S.C. §§ 636, 9005; Pub. L. 116–136.

of action against one such actor—PFG, the Debtor's secured lender, who knowingly and willfully exercised its control over the Debtor's deposit accounts to obtain a windfall recovery from a PPP loan overpayment obtained by the Debtor under highly suspicious circumstances, at the expense and to the detriment of the Debtor's other credits and, ultimately, the American taxpayers.

2.      As discussed below, in May 2020, the Debtor obtained a $975,000 PPP loan under circumstances so troubling that the Debtor's third-party accounting firm immediately notified both the Debtor **_and_** PFG that it was resigning. Where the Debtor's accountants saw potential misuse of the PPP loan program, however, PFG saw opportunity. The day the PPP loan was funded to Pervacio's account, PFG swept the entire balance out of Pervacio's account and into an account controlled by PFG. PFG then wired $425,000 to its own private account and subsequently applied these funds to outstanding fees allegedly owed by the Debtor to PFG. When Pervacio approached PFG on the eve of bankruptcy to return a portion of the PPP loan because it had determined that it would be unable to apply for loan forgiveness in light of the way the loan proceeds were used, PFG's lawyers advised Pervacio that PFG would not return any of the money and that the loan could simply be discharged in bankruptcy. As a direct result of PFG's deliberate actions, the entire balance of the Debtor's PPP loan became immediately ineligible for forgiveness, the proceeds of the PPP loan were used for improper purposes, and the Debtor lost the ability to return a substantial portion of the loan overpayment as required by the Small Business Administration ("SBA") regulations governing the PPP program.

3.      PFG is a sophisticated venture capital fund that currently manages in excess of 40 commercial credits, has a "strategic partnership" with Silicon Valley Bank, and was advised by competent counsel at all relevant times. Notably, however, in addition to disregarding the express provisions of the PPP regulations, PFG willfully ignored obvious indicia of fraud with respect to

the Debtor's PPP loan. Pervacio's founder and CEO Sanjay Kanodia ("Mr. Kanodia"), who applied for the PPP loan on behalf of Pervacio, testified on multiple occasions under oath that he never expected to receive so much money.[3] PFG, by its own account, was similarly "skeptical of the size" of the PPP loan and had "always been concerned about the financial controls in [Pervacio]."[4] Moreover, Armanino, a third-party accounting firm hired by Pervacio in part on the recommendation of PFG, promptly quit as a result of the PPP loan. But while reports of ineligible companies coming forward and returning PPP loan overpayments flooded the news cycle, PFG opted instead to bury its head in the sand and refuse to return the money, despite *multiple* red flags and *multiple* opportunities to do so (*e.g.*, Pervacio's receiving six times more than it expected, Armanino's sudden resignation, Pervacio's plea to return at least 30% of the proceeds and apply for forgiveness, etc.). If, as the record appears to support, Mr. Kanodia either committed fraud or breached his fiduciary duty in obtaining a PPP loan in the amount of $975,000, the record is equally clear that PFG either *intentionally* aided and abetted that fraud or it was willfully ignorant and recklessly aided and abetted the fraud.

4.    The Debtor's Estate possesses numerous colorable claims against PFG in connection with the PPP loan. In addition to avoidance action claims under chapter 5 of the Bankruptcy Code, the Estate possesses colorable claims against PFG for aiding and abetting a breach of fiduciary duty. Beginning in April 2020, representatives of PFG encouraged Pervacio to apply for a PPP loan on at least two separate occasions. Once the PPP loan was actually approved and funded, PFG immediately exercised exclusive control over the loan proceeds by virtue of its

---

[3]    At the 341 meeting on October 8, 2020, Kanodia testified that he expected Pervacio to receive $150,000. At his deposition on December 15, 2020, Kanodia further testified that he did not expect to receive $975,000. *See* Kanodia Dep. 117:8–9 ("And my feeling was that, you know, we would probably qualified [*sic*] for 100K . . .").

[4]    Kahn Dep. 77:6–15.

control over the Debtor's deposit accounts. Within 48 hours of the loan funding, PFG had swept and retained nearly 45% of the loan proceeds. SBA regulations in effect at the time required ***75%*** of PPP loan proceeds to be applied to various enumerated "eligible expenses," which would have included ***Pervacio's*** rent, utilities and other necessary expenses, but not interest, fees or expenses related to existing debt.[5] Instead, PFG applied $425,000 to its own "expenses," which, according to PFG, likely consisted of a backlog of attorneys' fees. Thus, PFG's sweep and retention of $425,000 rendered impossible Pervacio's ability to obtain forgiveness of the full value of the PPP loan. Consequently, what began as a contingent, potentially forgivable liability became fixed as a $975,000 unsecured claim in this bankruptcy case as a result of PFG's unilateral actions. PFG's actions ***directly harmed*** this Bankruptcy Estate and, should the Settlement Motion be approved, PFG will not only be released of Estate claims for this harm but will also retain a windfall of at least $425,000.

5.       Upon information and belief, the Trustee's review of potential claims and causes of action against PFG primarily focused on the priority and perfection of PFG's asserted liens. At the 11th hour of negotiating an asset purchase agreement in connection with PFG's acquisition of substantially all of the Debtor's assets, however, PFG imposed a new term that it be granted a release of all Estate claims and causes of action. As described in more detail below, the APA that this Court approved is structured so that PFG credit bid over 90% of the purchase price that it "paid" to acquire substantially all of Pervacio's assets out of bankruptcy, furnishing barely over $100,000 in cash as part of the sale. Furthermore, this Court has already approved first interim fee applications of the Trustee and his counsel totaling over $175,000 for the period beginning

---

[5]       Although this threshold has subsequently been reduced to 60%, Pervacio would still have been out of compliance in light of the amount swept and applied by PFG.

September 9, 2020 and continuing through October 31, 2020. Assuming the Trustee and his counsel have accrued similar fees during the past two months and that they will continue to accrue fees as they wind down the Estate into the new year, it is reasonable to estimate that the total cost of Estate administration and wind down will be at least $350,000 and could easily exceed $500,000—all of which would constitute priority administrative expenses. Thus, should PFG have its way and the Settlement Motion be approved, PFG will have acquired all of Pervacio's assets and be shielded from liability to the Estate, in a chapter 7 case where the distribution to unsecured creditors will likely be $0. As the largest non-insider unsecured creditor of the Estate, Citibank submits that the Trustee's proposed settlement with PFG is neither fair nor reasonable to unsecured creditors. As likely the only potential source of recovery for unsecured creditors in this case, claims against PFG should be preserved for further investigation and prosecution on behalf of the Estate.

## BACKGROUND

6.      On September 9, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), thereby commencing the above-captioned bankruptcy case (the "Chapter 7 Case"). George L. Miller (the "Trustee") was appointed as the Chapter 7 Trustee of the bankruptcy estate of Pervacio, Inc. ("Pervacio," or the "Debtor") on the same day.

### A.      The PFG Loan

7.      On or around November 3, 2017, Pervacio and PFG entered into that certain Amended and Restated Loan and Security Agreement dated September 13, 2017 and restated as of November 3, 2017 (the "PFG Loan"). Kahn Dep., Citi Exhibit 3. The PFG Loan provided for a $4 million line of credit and $1.5 million term loan. *Id.* at Sch. 1, 2.

8.     Well before this Chapter 7 Case was filed, Pervacio struggled to pay its debts to PFG.[6] Within six months of executing the PFG Loan, the parties entered into a forbearance agreement regarding Pervacio's loan defaults. *See* Kahn Dep., Citi Exh. 4. In fact, between the execution of the PFG Loan and the filing of this Chapter 7 Case, PFG and Pervacio entered into three separate forbearance agreements and three separate loan modifications regarding the PFG Loan. *See* Kahn Dep., Citi Exhs. 4, 5, 6, 7, 8, 10. All six forbearance agreements and loan modifications contain a provision that requires the Debtor to pay all of PFG's expenses incurred in connection with each forbearance and modification. *Id.* As part of the various modifications to the PFG Loan, at least $2.6 million of back-end fees were converted to principal and added to the balance of the PFG Loan. *See* Kahn. Dep. 37:24–39:14 ("**Exhibit A**").

### B.     The PPP Loan

9.     On April 15, 2020, counsel for PFG sent an apparently unsolicited email to the Debtor to inquire whether Pervacio had applied for a PPP loan. *See* Kahn Dep., Citi Exh. 16 ("**Exhibit B**"). Two days later, a Principal of PFG and co-manager of Pervacio's account at PFG emailed the Debtor directly to inquire whether it had applied for a PPP loan on behalf of Pervacio, and, in response, the Debtor assured PFG that it had "reached out to [Pervacio's Citibank] rep." *See* Kahn Dep., Citi Exh. 17 ("**Exhibit C**").

10.     At the Pervacio deposition, the Debtor testified that it applied for the PPP Loan online on or around May 1, 2020. *See* Kanodia Dep. 86:14–22 ("**Exhibit D**"). After the Debtor's PPP Loan application was approved, Citibank issued that certain *Paycheck Protection Program Loan Note* dated May 1, 2020 to Pervacio in the amount of $975,000 (the "PPP Loan Note"). Kahn Dep., Citi Exh. 21 ("**Exhibit E**"). The PPP Loan Note includes a representation of the borrower,

---

[6]     PFG testified that Pervacio was "always tripping covenants." Kahn Dep. 28:14–16.

Pervacio, that "[a]ll financial, tax, payroll costs, and other information submitted to Lender, including in connection with Borrower's application for the loan evidenced by this Note is true, correct, and complete as of the date of this Note." *Id.* The PPP Loan Note also includes a borrower's covenant in bold font in the middle of page 3, which states:

> **Borrower covenants and agrees to use the Loan only for purposes authorized by the CARES Act.**

*Id.* Mr. Kanodia signed the PPP Loan Note on behalf of the Debtor as its CEO. *Id.*

11.     On May 2, 2020, the Debtor sent an email to PFG notifying them that it had applied for a PPP loan from Citibank "based on [PFG Counsel's] email" and that Citibank had approved the Debtor for a loan of $970,000.  *See* Kahn Dep., Citi Exh. 15 ("**Exhibit F**"). The Debtor testified on several occasions that it anticipated Pervacio being approved for a much smaller loan in the range of $100,000–150,000, and that the actual amount of the approved PPP Loan ($975,000) was significantly more than it had anticipated. *See* Kanodia Dep. 117:8–9. PFG likewise testified that it was "skeptical" not only regarding the size of the PPP Loan, but also that Pervacio had even obtained a PPP loan at all. Kahn Dep. 68:12–17.

12.     On May 5, 2020, Citibank funded the $975,000.00 proceeds of the PPP loan to the Debtor's Citibank account ending in 4279 (the "Citibank Account"). On May 6, 2020, the next day, $975,428.80, the entire balance of the Citibank Account, was swept out of the Citibank Account to an account at First Republic Bank ending in 9913 (the "Amp Management Account").[7]

13.     In or around the summer of 2019, at least in part at the suggestion of PFG, the Debtor engaged the accounting firm Armanino, LLP ("Armanino") to provide interim-CFO type

---

[7]     According to Pervacio, the Debtor's financial advisor, Armanino, established the Amp Management Account to manage the Debtor's revenues and protect them from prepetition judgments and garnishments obtained against the Debtor. Kanodia Dep. 78:1–79:14.

services for the Debtor. According to PFG, sometime during the 24 to 48 hours between the time
the PPP Loan was funded and when PFG wired $425,000 of PPP Loan proceeds to itself, Armanino
quit because "they were uncomfortable with the situation." Kahn Dep. 75:9–18. According to PFG,
Armanino's sudden resignation "caused [PFG] alarm" and "without them, [PFG] didn't have any
faith we could trust [Pervacio] managing the business going forward." Kahn Dep. 75:20–77:15.

14.     The PPP Loan proceeds were swept out of the Debtor's Citibank Account and to
the Amp Management Account pursuant to the following documents:

(a)     a Deposit Account Control Agreement dated June 20, 2019 (the "<u>June 2019
DACA</u>"), executed by and among (i) Citibank, (ii) the Debtor, and (iii) PFG;
and

(b)     a DACA Initial Instruction dated October 8, 2019 (the "<u>Initial Instruction</u>"),
in which PFG, as the secured party to the June 2019 DACA, directed
Citibank to prevent the Debtor from having any rights of withdrawal from
the Citibank Account and to initiate a funds transfer of all available funds
to the Amp Management Account *daily* at 12:00 p.m. (the "<u>Amp
Management Sweep Instruction</u>"). The Initial Instruction was signed by a
Manager for Partners for Growth V LLC, the general partner of PFG.

From October of 2019 through May of 2020 twenty-four (24) sweeps totaling $2,182,893.06 were
executed pursuant to the Amp Management Sweep Instruction, including the $975,428.80 sweep
including the PPP Loan proceeds on May 6, 2020.

15.     At 7:21 a.m. on May 7, 2020, counsel for PFG sent a Notice of Exclusive Control
("<u>NEC</u>") to First Republic Bank, where the PPP Loan proceeds had been swept, "exercising
exclusive control over the First Republic Account held by Armanino for the benefit of Pervacio"
and mandating that "First Republic shall only take instruction with respect to the account from
PFG until such time as PFG directs otherwise." Kahn Dep., Citi Exh. 16 ("**<u>Exhibit G</u>**"). When the
Debtor emailed counsel for PFG to ask what the NEC was for, counsel for PFG replied, "Bottom
line—PFG will be taking some funds and balance will go back to Citibank account where you can
pay whatever Pervacio decides is appropriate." *Id.* At 7:45 a.m. on May 7, 2020, counsel for PFG

sent another email to Armanino notifying them of the NEC and PFG's intent to exercise control over the account at First Republic Bank containing the PPP Loan proceeds. *Id.* According to PFG, it was around this time that Armanino tendered its resignation. Kahn Dep. 75:20–25.

16.    After exercising its rights pursuant to the NEC, PFG had exclusive control of nearly $1 million of new money funded under the PPP loan program. On April 24, 2020, before the Debtor had even applied for the PPP Loan, the SBA posted an Interim Final Rule ("IFR") that created a safe harbor: borrowers that repaid a PPP loan in full by May 7, 2020 would be deemed by the SBA to have applied for a PPP loan in good faith (the "PPP Safe Harbor"), regardless of the actual circumstances with respect to such loan application. SBA, Interim Final Rule, 85 Fed. Reg. 23,451 (Apr. 28, 2020) ("**Exhibit H**"). On May 8, 2020, the SBA posted a new IFR that extended the PPP Safe Harbor deadline to repay PPP loan proceeds from May 7, 2020 to May 14, 2020—a full week after PFG had obtained exclusive control of the entire PPP Loan. SBA, Interim Final Rule, 85 Fed. Reg. 29,845 (May 8, 2020) ("**Exhibit I**"). On May 20, 2020, the SBA extended the PPP Safe Harbor deadline a second time, to May 18, 2020. SBA, Interim Final Rule, 85 Fed. Reg. 31,357 (May 20, 2020) ("**Exhibit J**"). As a result of PFG's exercise of control over the PPP loan proceeds, however, Pervacio never had the opportunity to repay the full PPP loan amount it obtained, in compliance with the safe harbor provisions noted above or otherwise.

17.    Instead, after assuming exclusive control of the PPP Loan, PFG wired $425,000 (approximately 43.5% of the total proceeds) to its own account and released the remaining $550,000 to the Debtor's Canadian affiliate. Shortly thereafter, PFG terminated Armanino's account at First Republic Bank. PFG then issued a Disposition Notice dated May 8, 2020 (the "Disposition Notice"), in which PFG instructed Citibank to terminate the Amp Management Sweep Instruction and replace it with a new sweep instruction to an account ending in 4694 at

Silicon Valley Bank and listing PFG as the beneficiary (the "PFG Sweep Instruction"). The Disposition Notice was signed by the same Principal of PFG that emailed the Debtor on April 17, 2020 about applying for the PPP Loan and signed the Initial Instruction described above.

18.    On April 2, 2020, over a month before PFG took control of the PPP Loan proceeds, the SBA posted the First Interim Final Rule. SBA, Interim Final Rule, 85 Fed. Reg. 20,811 (Apr. 2, 2020) (the "First IFR") ("**Exhibit K**"). Pursuant to Section III.r., under the heading "How can PPP loans be used?", the First IFR limits the use of PPP loan proceeds to payroll costs, employee benefit plan costs, mortgage interest payments, rent payments, utility payments, interest payments on debt incurred before February 15, 2020 and/or refinancing of EIDL loans. *Id.* at 20,814. Moreover, the First IFR mandates that "*at least 75 percent of the PPP loan proceeds __shall__ be used for payroll costs*." *Id.* (emphasis added). In addition to sweeping and applying an amount of the PPP loan that made it immediately impossible for Pervacio to ever meet the required threshold use of the proceeds for payroll costs, PFG applied all of the swept proceeds to pay fees accrued under the PFG Loan, which is not a permitted a use of PPP loan proceeds. PFG testified that, initially, it did not apply the money because it was concerned about Pervacio's ability to operate without financial controls (*i.e.*, Armanino's oversight), and that it did not recall when PFG actually applied the $425,000 to the Debtor's accrued liabilities. Kahn Dep. 94:9–18. When questioned why PFG released $550,000 back to the Debtor, PFG testified: "We were concerned that if we took all the money, which was our legal right, the company would have no cash." Kahn Dep. 85:21–86:12.

19.    On August 27, 2020, about two weeks before the Petition Date and when a bankruptcy filing appeared imminent, the Debtor emailed counsel for PFG to discuss returning the PPP Loan proceeds:

> We need to work properly on accounting for PPP. Legitimate funds we need to apply for forgiveness and rest of the funds we need to return. I've sent the same email to

Citibank through which we had PPP funding. . . . ***Like you said every thing will come to light. PFG will have to agree to return the funds that Pervacio is not qualified for*** and we will need to get a waiver from SBA and Citibank and PFG that everything is squared and no-one including PFG, Pervacio and myself are liable for anything related to PPP loan. ***I expect roughly 30% of the PPP loan will need to be repaid to SBA*** and rest of the loan we can apply for forgiveness. We will have to return some portion of PPP loan. ***I don't think we can apply for 100% forgiveness.*** It will become a liability for all of us.

Kanodia Dep., Citi Exh. 17 ("**Exhibit L**"). To that, counsel for PFG replied:

If the PPP loan isn't forgiven, it will be an unsecured obligation of Pervacio. It would be behind PFG and, unless you personally guaranteed the loan, should not be a personal obligation of you unless Citibank asserted a misrepresentation claim against you. The same would be true in a Pervacio bankruptcy. So we will not alter our proposal to take the PPP loan into account.

*Id.* Thus, in the four months between PFG's seizure of the PPP Loan proceeds and the filing of this Chapter 7 Case, PFG disregarded multiple opportunities to return the PPP loan proceeds, including a plea from the Debtor's principal.

## C.    The Bankruptcy Proceeding

20.    On September 22, 2020, the Trustee filed his *Motion of Chapter 7 Trustee for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(C), 364(C)(2), 364(D)(1), 364(E) and 507 of the Bankruptcy Code (I) Authorizing Chapter 7 Trustee to (A) Obtain Post-Petition Secured Financing; and (B) Utilize Cash Collateral; and (II) Scheduling a Final Hearing Regarding Financing; and For Entry of a Final Order Pursuant to Rule 9019 of the Bankruptcy Code Approving Sharing Arrangement* [Docket No. 11] (the "Financing Motion"), which contemplated, among other things, that Estate liquidation proceeds would be distributed in the following manner of priority (the "Sharing Arrangement"):

i)    first, to pay any Trustee commission allowable under section 326 of the Bankruptcy Code (the "Trustee Commission Carve-Out," or the "First Distribution Tranche")

ii)    from the first $1 million thereafter, the Estate shall retain 10% of the proceeds (the "First Million Carve-Out") and PFG shall receive 90% of such proceeds

11

(collectively, the "Second Distribution Tranche");

    iii)  the next $300,000 shall be used to re-pay the Post-Petition Financing (the "Third Distribution Tranche");

    iv)  thereafter, the Estate shall retain 10% of the proceeds (the "Additional Carve-Out" and together with the First Million Carve-Out, the "Estate Carve Outs") and PFG shall receive 90% of such proceeds (collectively, the "Fourth Distribution Tranche").

Financing Mot. at 7 ¶ 18. The Financing Motion indicates that PFG asserted control of the Debtor's prepetition marketing efforts by, among other things, inserting itself directly into the Debtor's business operations, including "numerous discussions with the Debtor's customers and employees" and "ongoing discussions with seven potential buyers." *Id.* at 6 ¶ 14. On October 16, 2020, this Court entered its *Final Order Pursuant to Sections 105, 361, 362, 363(C), 364(C)(2), 364(D)(1), 364(E) and 507 of the Bankruptcy Code Authorizing Chapter 7 Trustee to (A) Obtain Post-Petition Secured Financing; (B) Utilize Cash Collateral; and (C) Obtain Related Relief* [Docket No. 43] (the "Final Financing Order").[8]

    21.    On September 22, 2020, the Trustee filed his *Chapter 7 Trustee's Motion for (I) An Order Establishing Bidding Procedures and Granting Related Relief, and (II) An Order Approving the Sale of the Assets* [Docket No. 12] (the "Sale Motion"), in which the Trustee sought to conduct a 363 sale of substantially all of the Debtor's assets. The Court entered an Order approving the proposed bidding procedures in the Sale Motion and further scheduling a final hearing on the Sale Motion on November 4, 2020 at 10:00 a.m. [Docket No. 27] (the "Bidding Procedures Order"). On October 26, 2020, the Trustee filed his *Notice of Proposed Order Pursuant to 11 U.S.C.*

---

[8]    The Final Financing Order approved substantially all terms of the Financing Motion on a final basis *except* that the Third Distribution Tranche in the Sharing Arrangement was increased from $300,000 to $504,000 to account for the $504,000 post-petition loan by PFG (the "Post-Petition Financing"), all other Distribution Tranches remaining the same. Final Financing Order at 6 ¶ 9.

*§§ 105(A), 363 and 365, and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 (I)*

*Approving the Sale of Substantially All Assets of the Debtor; (II) Approving the Assumption and*

*Assignment of Certain Executory Contracts Related Thereto; and (III) Granting Related Relief*

[Docket No. 48] (the "Proposed Sale Order"). The Proposed Sale Order set an objection deadline

of October 28, 2020.

22.    On October 8, 2020, the Trustee held the First Meeting of Creditors pursuant to

section 341 of the Bankruptcy Code (the "341 Meeting"). At the 341 Meeting, the Debtor's

representative answered questions posed by counsel for Citibank. When asked "where is the PPP

Loan," the Debtor's representative responded "PFG has control over some of that. Part of it was

used for payments of Pervacio expenses, and part of it was used for PFG's loan payment." When

asked "how did you calculate the $975,000 loan," the Debtor's representative responded "I did not

calculate it. Our understanding was that the maximum amount we would get was $150,000. We

did not know we would get $975,000."

23.    On November 2, 2020, the Trustee filed his *Notice of Successful Bid and Bidder for*

*the Debtor's Assets* [Docket No. 60] (the "Bidder Notice"), identifying PFG as the successful

bidder and attaching to the Bidder Notice as Exhibit A that certain *Asset Purchase Agreement by*

*and Between George L. Miller, Solely as Chapter 7 Trustee of the Bankruptcy Estate of Pervacio,*

*Inc., and Partners for Growth V, L.P. or its Assignee, as Buyer Dated as of November 2, 2020* (the

"APA"). The APA states that the "aggregate consideration (the 'Purchase Price') for the sale and

transfer of the Acquired Assets ***and for a full release of all claims of the Estate against the Buyer***

***(which shall be subject to a duly-noticed 9019 compromise motion with Buyer assuming the risk***

***that such motion is not granted***) is (i) $1,554,000 US Dollars, plus . . . ." APA at 3 Art. 2 § 2.1

(emphasis added). Thus, the consideration PFG bargained for included not only the Acquired

Assets but also a full release of all claims the Estate possesses against PFG (the "<u>Proposed</u> <u>Release</u>"). The Bankruptcy Court held a final hearing on the Sale Motion two days later, on November 4, 2020. At the sale hearing on November 4, counsel for Citibank appeared and expressly reserved Citibank's right to object to the Proposed Release. PFG proceeded to close on its acquisition of substantially all of the Debtor's assets or about November 20, 2020. Settlement Mot. at 3 ¶ 10.

24.    On November 23, 2020, the Trustee filed the current Settlement Motion, which follows the APA in proposing a full release to PFG. Settlement Mot. at 3 ¶ 8 (". . . a full release of all claims of the Estate against PFG, with such release being subject to a duly-noticed 9019 motion and with PFG assuming the risk that such motion is not granted."). In the Settlement Motion, the Trustee asserts that "PFG received not less than $425,000 of cash that appears to have been the proceeds of a $975,000 PPP loan, which amount reduced PFG [*sic*] secured claim." Settlement Mot. at 4 ¶ 16 (emphasis added). According to the Trustee, the cash value of the Proposed Release is approximately $80,000, which reflects (i) a $50,000 increase in the purchase price at closing plus (ii) 10% of the proceeds of accounts receivable for services provided in September and October (the "<u>Earnout</u>"). *See id.* at 5 ¶ 18. The Trustee also asserts that $80,000 represents approximately 20% of any claim the Estate may hold against PFG without the attendant costs of litigation. *Id.* For these reasons, the Trustee asserts that the settlement is reasonable.

## **OBJECTION**

### I.    **Applicable Law**

#### A.    **Settlements Must be Reasonable and Fair and Equitable to the Estate**

25.    Federal Rule of Bankruptcy Procedure 9019 authorizes Bankruptcy Courts to approve a compromise of a claim. The process of considering a motion to compromise "requires

a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). The Third Circuit recognizes four criteria that a bankruptcy court should consider in striking this balance:

(1)     The probability of success in litigation;
(2)     The likely difficulties in collection;
(3)     The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and
(4)     The paramount interest of creditors.

*Id.* The fourth factor seeks to maximize value for creditors and "often involves an exercise of risk/reward of cost benefit." *In re Summit Metals, Inc.*, 477 Fed. Appx. 18, 22 (3d Cir. 2012) (approving of district court's reasoning).

26.     Furthermore, "a trustee has a fiduciary relationship with *all* creditors of the estate." *Martin*, 91 F.3d at 394 (alteration in original) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354–55 (1985)). The Bankruptcy Code requires a Trustee to "investigate all sources of income for the estate and 'collect and reduce to money the property of the estate.'" *Martin*, 91 F.3d at 394. In pursuit of his duty to "maximize the value of the estate," the Trustee is "bound to be vigilant and attentive in advancing [the estate's] interests." *Id.* (citations omitted).

27.     When a motion to compromise presents the Trustee with "a conflict between [his] fiduciary duty to the creditor body as a whole and the alleged duty to go forward with a settlement agreement favoring one creditor but otherwise detrimental to the estate," it is the duty of the Court, not the Trustee, to pursue the course of action that maximizes the value of the *estate* as a whole. *See id.* ("We cannot require a trustee [him]self to choose between these conflicting legal obligations. Rather, Rule 9019(a) demonstrates the legislature's intent to place this responsibility with the bankruptcy court."). Moreover, "[i]n order to make such a determination, the bankruptcy

court must be apprised of all relevant information that will enable it to determine what course of action will be in the best interest *of the estate*." *Id.* (emphasis added).

28.     Finally, the debtor or the bankruptcy trustee *alone* bear the burden of proving to the Bankruptcy Court that a settlement is reasonable and in the best interests of the entire estate— the burden does not fall upon objecting parties to prove that the settlement is unreasonable. *See In re Key3Media Grp.*, Inc., 336 B.R. 87, 93 (Bankr. D. Del. 2005), *aff'd*, Case No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006) (". . . the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved."); *see also In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) ("The trustee, as the party proposing the compromise, has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.").

### B.     Aiding and Abetting Breach of Fiduciary Duty or Fraud under Applicable State Law

#### 1.     Delaware Law

29.     Under Delaware state law, the four elements of aiding and abetting a *breach of fiduciary duty* are: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (internal citations omitted). With respect to the third (iii) element, "the aider and abettor must act knowingly, intentionally, or with reckless indifference . . . that is, with an illicit state of mind." *Id.* (internal quotations omitted). Knowing participation in a board's fiduciary breach requires that the third-party act with the knowledge that the conduct advocated or assisted constitutes such a breach. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001).

30.     Moreover, under Delaware law, the elements of a claim for aiding and abetting a *fraud* are: "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance." *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, Case No. CV 2019-0567-AGB, 2020 WL 4355555, at *20 (Del. Ch. July 30, 2020) (citations omitted). Like the pleading requirements for fraud, the knowledge element of an aiding and abetting claim under Delaware law can be averred generally, and all that is required to show that a defendant knew something are sufficient well-pleaded facts from which it can reasonably be inferred that this something was knowable and that the defendant was in a position to know it. *Id.*, 2020 WL 4355555, at *20 (quotations omitted). As to the third element, "substantial assistance" means only that "the secondary actor must have provided assistance . . . or participation in aid of the primary actor's allegedly unlawful acts." *See In re Oracle Corp. Deriv. Litig.*, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020) (quoting Restatement (Second) of Torts § 876 cmt. d (1979)).

31.     The elements of fraud in Delaware include: "1) the existence of a false representation, usually one of fact, made by the defendant; 2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; 3) the defendant had the intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff acted or did not act in justifiable reliance on the representation; and 5) the plaintiff suffered damages as a result of such reliance." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003). Furthermore, fraud may also occur through deliberate concealment of material facts, *or by silence in the face of a duty to speak*. *Id.* (emphasis added).

##       2.       **New York Law**

32.     Under New York state law, "[a] claim for aiding and abetting a ***breach of fiduciary duty*** requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant

knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (2003) (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir. 1987)). Moreover, the Second Circuit's recognition of a claim for aiding and abetting a breach of fiduciary duty "is based upon the New York courts' longstanding acceptance of the principle that [anyone] who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the *cestuis que trust*." *Id.* at 848 (citing *Wechsler v. Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941)).

33.     The elements of aiding and abetting of a ***fraud*** under New York law include:

the existence of the underlying fraud, actual knowledge, and substantial assistance. This Court has stated that actual knowledge need only be pleaded generally, cognizant, particularly at the prediscovery stage, that a plaintiff lacks access to the very discovery materials which would illuminate a defendant's state of mind. Participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud. The Court of Appeals has stated that an intent to commit fraud is to be divined from surrounding circumstances. This is not . . . constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances.

*Oster v. Kirschner*, 77 A.D.3d 51, 55–56, 905 N.Y.S.2d 69 (2010) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553 (2009)). The elements of the underlying fraud include: "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *William Doyle Galleries, Inc. v. Stettner*, 91 N.Y.S.3d 13, 17 (2018).

## II.     The Proposed Settlement Fails the Third Circuit's Four-Factor Analysis Because it is Patently Unreasonable, Unfair and Inequitable to Anyone Other than PFG

34.     Analyzing the Third Circuit's four factors in light of compelling evidence that the Estate possesses valuable claims against PFG shows that each factor favors ***denying*** the Settlement Motion.

### A.    The Trustee or Another Estate Representative Would Likely Succeed in Prosecuting Estate Claims Against PFG

35.    *First*, given the evidence of misconduct already discovered by Citibank following limited formal discovery, after a more comprehensive investigation, the Trustee or another representative of the Estate would likely succeed on a number of claims against PFG, including fraudulent transfer, aiding and abetting a fraud or breach of fiduciary duty (described in more detail below), tortious interference with an existing contract,[9] restitution for unjust enrichment,[10] and possibly others.[11] Some of the claims Citibank has identified are discussed in more detail below.

---

[9]    In Delaware, "interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981). When Mr. Kanodia approached PFG to return a portion of the money because he believed Pervacio could not apply for loan forgiveness, counsel for PFG advised Mr. Kanodia that he was not personally liable for the debt and that the Debtor could simply discharge it in bankruptcy. Regardless whether PFG knew the Debtor was legally obligated to return the Overpayment under federal law, PFG intentionally prevented the Debtor from doing so in breach of its contract with Citibank, who disbursed the loan on behalf of the Small Business Administration, a federal regulatory agency.

[10]    In Delaware, the elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). "Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff." *Urdan v. WR Capital Partners, LLC*, CV 2018-0343-JTL, 2019 WL 3891720, at *20 (Del. Ch. Aug. 19, 2019), *aff'd*, 423, 2019, 2020 WL 7223313 (Del. Dec. 8, 2020) (internal quotations omitted). Should the 90-day preference period prevent the Trustee from successfully prosecuting a preference claim against PFG under the bankruptcy code, the Bankruptcy Court may alternatively impose an equitable lien in favor of the Estate on the $425,000 swept by PFG. Such a lien arises in equity because the Estate was entitled to pursue forgiveness of the PPP Loan by either applying the $425,000 to eligible expenses or returning the money to the SBA. *See, e.g.*, *In re Wells*, 160 B.R. 726, 728 (Bankr. N.D.N.Y. 1993) (imposing equitable lien in favor of former husband whose unsecured claim to proceeds due on sale of marital residence would otherwise be discharged in Chapter 7 bankruptcy of former wife).

[11]    PFG testified at its deposition that PFG held the $425,000 in a PFG account for a while before applying the proceeds. Kahn Dep. 94:13–18. The Debtor filed for bankruptcy protection on September 9, 2020, 122 days after PFG wired the money to Silicon Valley Bank. Should the $425,000 of PPP Loan proceeds have remained unapplied and within PFG's control for thirty-two (32) days or more, it is possible that PFG could have returned the funds within the preference period and that the transfer is subject to a preference action pursuant to 11 U.S.C. § 547.

B.      **Any Judgment Rendered Against PFG is Readily Collectible**

36.      *Second*, the Trustee or other Estate representative should be able to collect on any judgment rendered against PFG because PFG is a wealthy venture capital firm that has already availed itself of this court's jurisdiction and because PFG seized and retained at least $425,000 of cash from the Debtor.

C.      **The Prosecution of Estate Claims Will Be Straightforward and Expedient**

37.      *Third*, the litigation will be neither complex, expensive, nor inconvenient, as there is only one creditor involved, PFG, who has been actively involved in the administration of the Estate. Building upon Citibank's preliminary discovery, the Trustee or other Estate representative will be able to conduct focused, pinpoint discovery. Although PFG has refused to produce a significant number of documents on the basis of attorney/client privilege, further discovery, including from third-parties like Armanino, would likely shed additional light on the extent of PFG's knowledge and involvement with respect to the PPP loan.

D.      **Prosecution of the Estate's Claims Against PFG is in the Paramount Interest of Creditors, Who Stand to Receive Nothing if the Settlement is Approved**

38.      *Fourth*, given that the Estate could realize *at least* $425,000 of additional value by prosecuting its claims against PFG and that, alternatively, the distribution to unsecured creditors will likely be $0 if the Settlement Motion is approved, the benefits of denying the Settlement Motion and allowing an appropriate Estate representative to prosecute Estate claims far outweigh the costs.

1.      **The Estate Has Approximately $180,000 of Unencumbered Cash**

39.      Despite the purported $80,000 consideration PFG allegedly provided to the Estate in exchange for the Proposed Release, unsecured creditors will likely receive $0 given the structure of the Sharing Arrangement, the Post-Petition Financing, and the APA. The APA allowed PFG to

credit bid over 90% of its $1.554 million purchase price for the assets. This allowed PFG to purchase the Acquired Assets while providing only $150,000 cash to the Trustee at closing. Additionally, the APA provides that 10% of two months' worth of revenues were retained by the Estate pursuant to the Earnout. The Trustee has yet to disclose the precise value of the Earnout, but upon information and belief it is approximately $30,000. Thus, the total pot of cash available to fund distributions is approximately $180,000.

### 2.    The Estate's Administrative Expenses Likely Exceed $180,000

40.    Before any distribution to unsecured creditors, that money will first be applied to: (a) the Trustee's administrative expenses, which as of October 31, 2020 were $175,000 and which will continue to accrue into the new year; and (b) the cost of winding down this case. Given that at least two months of additional Trustee's fees will be layered onto the existing $175,000 that has been approved by this Bankruptcy Court, the Estate has likely already incurred expenses in excess of $180,000, leaving nothing to fund any distribution to unsecured creditors.[12]

### E.    The Trustee Agreed to Add the Release as a Term to the APA Under Inequitable Circumstances in Which PFG Possessed Overwhelming Leverage

41.    The Proposed Release was an 11th hour term imposed by PFG on the Trustee with no notice to or involvement of other creditors. Sometime during the 48 hours between when the Trustee declared PFG the only successful bidder on November 2, 2020 and the final hearing on

---

[12]    Under the Sharing Arrangement, the liquidation proceeds will be distributed in the following order of priority: first, to the Trustee's allowed costs pursuant to 11 U.S.C. § 326; second, the next $1,000,000 to be split 90% to PFG, 10% to the Estate; third, the next $504,000 to PFG to repay the Post-Petition Financing; and fourth, any excess proceeds to be split 90% to PFG, 10% to the Estate. See Final Financing Order, Docket No. 43 at 6. Thus, the most the Estate could possibly collect on the first $1,504,000 is $100,000, which essentially assumes zero Trustee fees or operating expenses. This Court has already approved first interim fee applications totaling roughly $177,000 for the Trustee and his counsel through the period ended October 31, 2020 [Doc. Nos. 73, 75]. Given that the Trustee and his counsel continue to incur administrative expenses, it is reasonable to assume that the distribution to general unsecured creditors in this case will be zero unless the Settlement Motion is denied and claims against PFG are prosecuted.

the Sale Motion on November 4, 2020, PFG demanded that the Proposed Release be added to the terms of the APA. Thus, at the 11th hour, when the Trustee had no other option but to acquiesce, PFG sought a full release of all Estate claims.[13]

42.    As discussed above, the sale of the Debtor's assets to PFG provided only approximately $180,000 of unencumbered cash to the Estate. Presumably, PFG intended to leave the Trustee with just enough money to conduct the sale, administer the estate, and collect his fee, but not to prosecute Estate claims against PFG. *See* Settlement Mot. at 5 ¶ 18 ("Moreover, it is unclear whether PFG would have been willing to close on any transaction absent receiving a full release."). PFG's payment of only $180,000 in cash for the Acquired Assets eliminated any possibility of the Estate distributing more than $0 to unsecured creditors.[14] Thus, PFG forced the Trustee into a position where he had little incentive and even less money to prosecute the Estate's claims and his only rational choice was to acquiesce to PFG's demand for a full release. As soon as he was appointed, the Trustee operated from the untenable position of trying to administer the bankruptcy estate fairly and equitably despite PFG wielding overwhelming influence in the decision process at every stage of this bankruptcy case—from controlling the prepetition marketing process, to carrying the weight typically associated with prepetition and postpetition lenders during a bankruptcy case, to acquiring substantially all of the Debtor's assets at a failed auction and negotiating the sale from a position of immense leverage over the Trustee.

43.    Now, the Trustee understandably believes he is obligated to move forward with the Settlement Motion and pursue the Proposed Release as a term of the APA. But the Trustee arrived

---

[13]    Fortunately, the Trustee refused to make closing of the sale contingent upon approval of the Settlement Motion, as evidenced by the fact that the Sale already closed on or around November 20, 2020.

[14]    *See* discussion *infra* Section II.D.

at his position based on the limited discovery he was able to perform and under pressure from PFG, who possessed overwhelming leverage over the Trustee in negotiations. It is likely that, given the bind PFG put the Trustee in, the Trustee arrived at a conclusion that is ***not*** in the best interests of the ***Estate*** but is, instead, only in the best interests of ***PFG***. Having supplemented the Trustee's original discovery with formal discovery of its own, Citibank possesses new evidence that demonstrates not only that the consideration PFG provided for the Proposed Release is wholly inadequate, but also that prosecution of the Estate's claims against PFG—not settlement—best serves the paramount interest of the Estate as a whole.

44.     Under these circumstances, Citibank respectfully requests that the Bankruptcy Court step in and be "vigilant and attentive in advancing [the estate's] interests," as intended by Rule 9019(a) and the Third Circuit. *See Martin*, 91 F.3d at 394. But, to do so, this Court should first "be apprised of ***all*** relevant information that will enable it to determine what course of action will be in the best interest of the ***estate***," which would require a full investigation into the Estate's claims against PFG. *See id.* (emphasis added).

## III.    The Estate Possesses State Law Causes of Action against PFG for Aiding and Abetting a Breach of Fiduciary Duty and a Fraud

45.     Upon information and belief, the PPP Loan application Mr. Kanodia submitted to Citibank on behalf of the Debtor contained materially misleading information designed to obtain approval of a loan for more than the amount to which the Debtor would otherwise have been entitled. As CEO, Mr. Kanodia owed a fiduciary duty to the Debtor. To the extent Mr. Kanodia caused the Debtor to submit a fraudulent loan application, he breached that duty. Contrary to the express borrower's warranty in the PPP Loan Note that all information furnished to Citibank in connection with the application was true and accurate, Mr. Kanodia submitted misleading data that induced Citibank to issue a PPP Loan for ***over 600%*** of what the Debtor believed it was entitled

to, according to his testimony on multiple occasions. *See* Kanodia Dep. 117:8–9 ("And my feeling was that, you know, we would probably qualified [*sic*] for 100K . . .").

46.      ***PFG knew all of this***. PFG encouraged the Debtor to apply for the PPP Loan at least two times in April of 2020 despite knowing that his business was based almost entirely on foreign contractors and despite having no faith they could trust him running the company. According to PFG's testimony, when the Debtor informed PFG that the Debtor had been approved for a $970,000 loan, not only were they skeptical of the size of the loan but they were skeptical he had even received one. When Armanino—the Debtor's third-party accounting firm and PFG's only trusted source of financial information—quit within 24 hours of the PPP Loan's funding, instead of scrutinizing the size of the loan, returning the money to the SBA, or even giving the money back to the Debtor, ***PFG took exclusive control of the PPP Loan and applied a substantial portion of it to repay its own expenses***. Worse, when the Debtor, understanding that it could not apply for PPP Loan forgiveness, approached PFG to discuss PFG's returning 30% of the PPP Loan proceeds to the SBA, PFG simply refused. The Debtor tried to right its wrong and return some of the money, but PFG was unwilling to forgo the opportunity to realize a windfall at the expense of other creditors of the Estate.

47.      Among other claims, the Estate possesses colorable claims for (a) aiding and abetting breach of fiduciary duty and (b) aiding and abetting a fraud under both Delaware and New York state law.[15] The many badges of fraud described in this objection are apparent and, even at this pre-discovery phase of litigation, are compelling evidence of the Estate's claims against PFG. Mr. Kanodia breached his fiduciary duty to the Debtor when the Debtor received far more than it

---

[15]      The Debtor is a Delaware corporation. The PPP Loan Note includes a choice of law provision specifying that New York law controls.

was entitled to under the PPP and failed to return the overpayment, foreclosing the possibility of forgiveness and fixing an otherwise forgivable debt. PFG aided and abetted when they refused, on many occasions, to return what discovery has shown they knew or should have known was an overpayment and when they refused to return any portion of the PPP Loan to the SBA after Mr. Kanodia pleaded with them to do so. Likewise, Mr. Kanodia potentially committed a fraud against the SBA and the American taxpayers by submitted misleading data and inducing Citibank to furnish an inflated loan to which the Debtor was not entitled. PFG, aware of the overpayment, refused to return any portion of the proceeds to the SBA and advised Mr. Kanodia that the debt could simply be discharged in bankruptcy. These claims alone provide a sufficient basis for this Bankruptcy Court to deny the Settlement Motion.

## RESERVATION OF RIGHTS

48.     Citibank reserves all rights to request, pursuant to Fed. R. Bankr. P. 2004 or otherwise, additional documents or examinations upon review of the documents produced in connection with this Objection or otherwise. Additionally, for the avoidance doubt, Citibank reserves the right to further object to the Settlement Motion to the extent the relief sough therein seeks to release, modify or impair, in any way, any direct claims or causes of action that any creditor of the Debtor may have or assert against PFG.

## STATEMENT PURSUANT TO LOCAL RULE 9013-1(f)

49.     Pursuant to Local Rule 9013-1(f), Citibank does not consent to the entry of a final order by the Bankruptcy Court in connection with the Settlement Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## NOTICE

50.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee

for the District of Delaware; (ii) the Trustee; (iii) counsel for PFG; and (iv) counsel for the Debtor.

## CONCLUSION

**WHEREFORE**, based on the foregoing, Citibank respectfully requests that the Court

(i) deny the Settlement Motion, and (ii) grant such other and further relief as is just and proper.

Dated: December 28, 2020      **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Wilmington, DE

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Joseph C. Barsalona II (No. 6102)
1201 N. Market St., 16th Floor
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@mnat.com
         jbarsalona@mnat.com

- and -

**HAYNES AND BOONE, LLP**
Matt Ferris
2323 Victory Avenue, Suite 700
Dallas, TX  75219-7672
Telephone: (214) 651-5955
Facsimile: (214) 200-0393
Email: matt.ferris@haynesboone.com

*Counsel to Citibank, N.A.*

14421411.1