IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> PERVACIO, INC., <br><br> Debtor. | Chapter 7 <br><br> Case No. 20-12096 (JTD) <br><br> Re: D.I. 76 <br> Hearing Date: January 27, 2021 at 10:00 a.m. |

**REPLY TO CITIBANK'S OBJECTION TO MOTION OF
CHAPTER 7 TRUSTEE FOR ORDER APPROVING SETTLEMENT
WITH AND RELEASE OF PARTNERS FOR GROWTH V, L.P.
PURSUANT TO FED. R. BANKR. P. 9019 [D.I. 76]**

Partners for Growth V, LP ("PFG"), by and through its counsel, hereby replies to Citibank's Objection to Motion of Chapter 7 Trustee for Order Approving Settlement with and Release of Partners for Growth V, L.P. pursuant to Fed. R. Bankr. P. 9019 [D.I. 76] (the "Motion"). In support of this Reply, PFG respectfully states as follows:

**PRELIMINARY STATEMENT**

1.  Seeking to recover some portion of the million dollar loan that apparently it now regrets making to Debtor, Citibank attempts to disrupt an arms-length negotiated settlement, apparently looking at PFG as the only available "deep pocket" to provide relief to the Estate. That relief, however, would only marginally, if at all, redound to Citibank's benefit. PFG suffered dramatically greater losses than did Citibank when Debtor failed, and lost more still when PFG funded Debtor's post-petition sale efforts that were hoped to bring in substantial funds for the benefit of all creditors. Such are the consequences of bankruptcy.

2.  Citibank, the only party challenging the Trustee's decision to settle doubtful claims against PFG in return for consideration he calculates is worth at least $80,000, claims that Debtor's principal, Sanjay Kanodia, obtained a $975,000 PPP loan through fraud and breach of fiduciary duty. Citibank fails to explain how those alleged acts caused any damage to the Estate, since the

- 1 -

proceeds of the loan were used to pay claims that otherwise would have been asserted against the Estate. Further, Citibank does not point to any evidence tending to support those charges. Instead, Citibank places unwarranted reliance on Mr. Kanodia's alleged surprise that Debtor would be approved for such a large loan and the decision of Debtor's accountant to resign purportedly because it was "uncomfortable" with the loan situation. Citibank offers nothing that would enable the Court to conclude that the Estate would have any hope of succeeding on claims based upon Mr. Kanodia's allegedly wrongful conduct.

3. More troubling still, Citibank points to no evidence of PFG's involvement with Mr. Kanodia's efforts to obtain a PPP loan, or that PFG knowingly provided assistance in the purported fraud and/or breach of fiduciary duty. Citibank instead relies on two innocuous emails in which PFG and its counsel merely asked whether Debtor had applied for the loan that Debtor's counsel previously stated it was considering. Mr. Kanodia confirmed that PFG was not in any way involved with the application process. No evidence exists that PFG knowingly participated in any fraud or breach of fiduciary duty that Mr. Kanodia allegedly committed.

4. The Trustee acted reasonably in determining that it was in the Estate's best interests to settle the dubious potential claims against PFG in return for consideration that he valued at $80,000, a windfall for a bankruptcy estate of a debtor whose primary secured creditor was so dramatically undersecured. The Motion should be granted, and the settlement approved.

**THE SETTLEMENT AND RELEASE SHOULD BE APPROVED AS FAIR, REASONABLE, AND IN THE ESTATE'S BEST INTERESTS**

5. Compromises are favored in bankruptcy proceedings because they minimize litigation and expedite the administration of the bankruptcy estate. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). In frustration of this goal, Citibank seeks to create problematic and expensive litigation and delay the administration of the bankruptcy estate to the detriment of the Estate.

6. The Court must decide whether a compromise under Rule 9019 is fair, reasonable, and in the best interest of the estate. *In re Washington Mutual, Inc.*, 442 B.R. 314, 327–328 (Bankr. D. Del. 2011). The Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness. *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014). In doing so, the Court must consider the four factors set forth in *In re Martin*, *supra*. Those factors are (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors. *In re Martin*, 91 F.3d at 393. As will be demonstrated below, three of these factors militate strongly in favor of approving the settlement and release, and one is not applicable.

### A. The Possibility of a Successful Claim against PFG Is Low

7. The most important factor in the approval analysis is the probability that the Estate could prevail on a claim against PFG for its retention of a portion of the PPP loan proceeds, because only a demonstrably high chance of success would warrant the expenditure of scarce resources to pursue it. Citibank has not pointed to any facts that would justify a conclusion that the probability of a successful claim is anything but extremely remote.

#### 1. Citibank Has Not Identified Any Evidence Suggesting that Mr. Kanodia Committed Fraud or Breach of Fiduciary Duty

8. Citibank's primary argument is that the Estate possesses claims against PFG for aiding and abetting Debtor's principal, Mr. Kanodia, in the commission of fraud or breach of fiduciary duty in obtaining the PPP loan. Any such charge necessarily depends on proof that Mr. Kanodia committed such a wrongful act. Glaringly absent, however, is any evidence, or even much argument, concerning specifically how Citibank was defrauded, or a breach of fiduciary duty occurred. While Citibank paints a dark picture of Debtor wresting far more loan proceeds from Citibank than Debtor's circumstances warranted, no evidence supports the accusation. Citibank

repeatedly claims only that Debtor received a larger loan than it expected, and that its accountant was uncomfortable with the loan and terminated its services. Neither fact establishes that Mr. Kanodia engaged in wrongful conduct.

9.     Citibank claims, on the basis of its information and belief, that the loan application Mr. Kanodia submitted contained materially misleading information, yet never even hints at the nature of that information. Citibank is in possession of the loan application and any related documents submitted to obtain the loan, and has taken Mr. Kanodia's deposition. Presumably, Citibank should know if it were wrongfully induced into making the loan, but the Objection does not contain any specific information supporting the claim. And though Citibank claims that the purportedly misleading information induced it to loan more than 600% of what Debtor expected, it offers no insight as to the nature of that information or why Citibank decided that the application warranted a loan in that amount.

10.    In evaluating the likelihood of success of any claim against PFG, the Court cannot rely on Citibank's unsubstantiated allegations of Mr. Kanodia's purported wrongdoing. There simply is no basis on which the Court could conclude that the Estate has any hope of proving that Mr. Kanodia fraudulently procured the loan, eliminating any conceivable basis for PFG's purported aiding and abetting liability. *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018) ("Because the underlying tortious conduct claim fails, Midland's aiding and abetting claim against OPC also fails"). For this reason alone, the probability of the Estate's succeeding on the alleged claims against PFG must be rated as low. In the event that Citibank improperly attempts to offer new evidence in its sur-reply to the Objection's deficiencies, such evidence should be ignored.

## 2. There Is No Evidence that PFG Knowingly Participated in the Alleged Fraud and/or Breach of Fiduciary Duty

11. Even if the Estate could present a colorable case of fraud and/or breach of fiduciary duty against Mr. Kanodia, a conclusion unwarranted by any evidence referenced in the Opposition, there is a dearth of evidence that PFG was complicit in his acts. As Citibank acknowledges, both Delaware and New York law require that PFG have actual knowledge of such wrongful conduct and knowingly assist in its commission before aiding and abetting liability can be imposed on it.[1] *See, e.g., RBC Capital Markets, LLC v. Jervis,* 129 A.3d 816, 861 (Del. 2015) (aiding and abetting breach of fiduciary duty requires **knowing participation** in the alleged breach); *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (2003) (aiding and abetting breach of fiduciary duty requires that the defendant **knowingly induced or participated** in the breach); *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, 2020 WL 4355555, at *20 (Del. Ch. July 30, 2020) (aiding and abetting fraud claim requires defendant's **knowledge** of the fraud and **substantial assistance** in its commission); *Oster v. Kirschner*, 77 A.D.3d 51, 55–56, 905 N.Y.S.2d 69 (2010) (same). Citibank fails, however, to identify any evidence even suggesting that PFG knew that Mr. Kanodia was engaging in any wrongful conduct to obtain the PPP loan—if in fact he was—or that PFG had any involvement whatsoever in that conduct.

12. Citibank suggests that PFG instigated Debtor's efforts to obtain a PPP loan, but the Objection is devoid of any facts to support that fanciful scenario. The sole evidentiary basis for Citibank's position is two emails sent in April 2020 by PFG and its counsel asking whether Debtor had applied for a PPP loan. Citibank implies that these emails suggested that Debtor should apply

---

[1] Citibank cites numerous cases addressing how the various claims it advances can be generally pleaded. Citibank fundamentally misunderstands the scope of these proceedings. The issue is not whether the Estate could cobble together allegations sufficient to state a claim and survive a motion to dismiss. Rather, the focus must be on the ***merits*** of any claim asserted against PFG, and the truth of such allegations, to determine the probability of their successful assertion. Meaningful analysis of the ***facts*** the Estate necessarily would have to prove to prevail on a claim against PFG is conspicuously absent from the Objection.

for such a loan, when in fact Debtor already had made the decision to look into such loans weeks previously. Debtor's counsel informed PFG's counsel in March 2020 that Debtor intended to apply for government loans. (Declaration of Leo D. Plotkin ["Plotkin Decl."], ¶ 3.) Further, at Mr. Kanodia's deposition, Citibank's counsel suggested that Debtor first approached Citibank about a PPP loan in March 2020, confirming the sequence of events.[2]

13.     Citibank characterizes the first email, sent by PFG's counsel to Debtor's counsel on April 15, 2020, as "apparently unsolicited". (Objection at p. 6, ¶ 9.) That email was part of a chain addressing an entirely different matter—a levy on Debtor's bank account—and the offhand question about the PPP loan at the end of the message was simply counsel's follow-up question as to whether the government loans Debtor was investigating included a PPP loan. (Objection, Ex. B; Plotkin Dec., ¶ 3.) The email cannot be construed as instigating Debtor's loan application.

14.     Similarly, the second email, sent by PFG to Mr. Kanodia on April 17, 2020, also was focused primarily on a pending bank levy, and referenced a discussion the two just had. At the end of the email, PFG stated: "Also, I meant to ask: have you applied for PPP funds?" (Objection, Ex. C.) Again, the context establishes that the question was an unimportant afterthought after dealing with more pressing bank levy issues. Had PFG actually been actively encouraging Debtor to apply for PPP funds, the issue would not have been relegated to a follow-up email after the two had just been discussing other matters.

15.     Significantly, Mr. Kanodia was unaware of any discussions with PFG concerning a PPP loan before the two April 2020 emails, and testified that he had knowledge of the PPP program from sources other than PFG. (Kanodia depo. at 62:13-64:7, attached hereto as Ex. A.)

---

[2] Citibank's counsel asked Mr. Kanodia: "[I]f I represented to you that [Mr. Kanodia initially reached out to Citibank about the PPP loan] in March of 2020, would that – would you have any reason to think that's not correct?" Mr. Kanodia confirmed that he was inquiring about that time because that was when the program started. [Kanodia depo. at 62:13-25, attached hereto as Ex. A.]

Further, when Mr. Kanodia was asked whether PFG had any involvement in his decision to apply for the PPP loan other than the previously-referenced emails, Mr. Kanodia testified "No, sir, absolutely not." (Kanodia depo. at 71:8-12, Ex. A hereto.) Citibank does not reference the existence of any evidence to dispute Mr. Kanodia's testimony.

16.     But even putting all of the foregoing aside, and assuming there was evidence that PFG encouraged Debtor to apply for a PPP loan, which plainly there is not, there is not a scintilla of evidence that PFG had any involvement in, or even knowledge of, the application process—despite the fact that PFG produced 587 pages of documents to Citibank in response to its document requests. There is nothing to suggest that PFG was aware the Debtor was misleading Citibank in any respect in obtaining the loan—assuming Debtor was in fact doing so—much less actively participating in that wrongful conduct. The hypothetical aiding and abetting claims would require the Estate to prove that PFG was aware that Mr. Kanodia was perpetrating a fraud on Citibank, and that PFG was providing substantial assistance. No evidence supporting such a claim exists, and Citibank does not even suggest otherwise.

17.     Unable to point to any evidence that PFG participated in Mr. Kanodia's alleged fraud, Citibank instead takes issue with PFG's enforcement of its security interest in the deposit accounts into which Citibank deposited the loan proceeds. Citibank makes much of the fact that PFG swept the loan proceeds into a different account immediately after they were deposited, but as Citibank admits, that sweep occurred *automatically* pursuant to the provisions of a Deposit Account Control Agreement ("DACA") executed almost a year previously. Significantly, **Citibank was a party to the DACA,** which covered the account *at Citibank* into which the loan proceeds were deposited. Again as Citibank admits, in October 2019 (months before Debtor applied for the PPP loan or the program even existed), PFG issued an instruction to Citibank directing it to transfer all funds that came into the Citibank account to a different account (which the Objection refers to

as the Amp Management account) ***every day at 12:00 p.m.*** Accordingly, Citibank was well aware that the loan proceeds would be automatically swept into the Amp Management account once Citibank deposited them into Debtor's account with Citibank, and was well aware that the transfer occurred automatically on a daily basis because Citibank was the one initiating the transfers. The PPP funds were treated no differently than any other funds deposited into Debtor's Citibank account. Citibank's insinuations that PFG acted improperly by sweeping the funds immediately after they were deposited do not withstand reasoned analysis.

18. Nor has Citibank suggested any theory of liability for PFG's decision to apply part of the swept funds to Debtor's indebtedness for the loan. Once the loan proceeds were deposited into the Citibank account that was subject to the DACA, they became PFG's collateral, a fact of which Citibank was well aware when it funded the loan.

19. Simply put, the Court has no information to support a conclusion that PFG had any knowledge of or participation in any fraud or breach of fiduciary duty by Mr. Kanodia. The absence of any factual basis for the aiding and abetting claims compels the conclusion that the probability of success is low. *In re Syntax-Brillian Corp.*, 573 F.App'x 154 (3d Cir. 2014) (absent allegations that lender knew or should have known of the alleged fraud and breach of fiduciary duty, trustee failed to state a claim for aiding and abetting). Again, any new evidence in Citibank's sur-reply should be ignored.

### 3. The Estate Suffered No Damage by Receiving the PPP Loan

20. As Citibank notes, damages are an element of the threatened aiding and abetting claims against PFG, as well as the underlying fraud and breach of fiduciary duty claims against Mr. Kanodia. But Citibank ignores this critical element, never addressing how the Estate purportedly was damaged by its receipt of the $975,000 PPP loan.

21. Citibank inconsistently asserts that Debtor never should have obtained the PPP loan, yet complains that PFG purportedly deprived Debtor of $425,000 of such funds that Citibank now thinks the Estate should recover. Citibank ignores the fact that Debtor had the use of $550,000 from the loan for its operations during 2020, and decreased its obligations to PFG with the balance of the loan proceeds. In effect, Debtor replaced $975,000 of secured and unsecured obligations with the $975,000 unsecured obligation to Citibank. The net effect to Debtor and the Estate is the same. Debtor simply was not damaged by its receipt of the loan.

22. In a similarly inconsistent vein, Citibank argues that PFG denied Debtor the ability to obtain loan forgiveness because PFG would not return the collateral to which it rightfully resorted. But again, Debtor was not damaged by the inability to obtain loan forgiveness because the bankruptcy precluded Citibank from attempting to collect the loan. While unsecured claims increased by the loan amount, Citibank repeatedly asserts that the unsecured creditors will not obtain any recovery, so the increase in the amount of unsecured claims is irrelevant.

23. Simply put, Debtor was not damaged by its receipt of the PPP loan. PFG therefore cannot be held liable to the Estate on any theory for exercising its rights to the $425,000 of collateral in Debtor's account. For this additional reason, there is a very low probability of success of any claims the Estate may assert against PFG.

    **4. Citibank Points to No Evidence Supporting Any Other Claims Against PFG**

24. Citibank relegates to a series of footnotes other potential claims it argues the Estate may hold against PFG, none of which possess any merit. Citibank asserts that PFG may have induced Debtor to breach its loan agreement with Citibank by refusing to accede to Mr. Kanodia's request to return the portion of the loan proceeds retained by PFG. Citibank has not established

that PFG lacked the right to realize upon its cash collateral in the Citibank account, or that PFG was obligated to return its collateral simply because Mr. Kanodia requested it. PFG certainly did not induce Debtor to breach whatever contract it had with Citibank.

25. Nor is there any basis for imposition of an equitable lien based on Debtor's plan to return a portion of the loan in order to obtain loan forgiveness. PFG's prior perfected security interest in deposit accounts is unchallenged, and there simply is no basis to avoid that priority by creating an "equitable lien" on funds to which PFG has the unqualified right. But in any event, as discussed above, Debtor was not harmed by the failure to obtain loan forgiveness because the loan was dischargeable in bankruptcy, and Citibank maintains that the unsecured creditors will not obtain any recovery, rendering an increase in the amount of unsecured claims irrelevant.

26. PFG has no preference liability because it simply enforced its security interest, granted years before the bankruptcy, in the deposit account. Regardless, PFG swept the PPP loan proceeds more than 90 days prior to bankruptcy. While Citibank asserts that PFG may have held on to such funds and then applied them within the preference period, Citibank's counsel was provided with documentary evidence more than a week before the Opposition was filed demonstrating that PFG transferred the $425,000 at issue to its own account at Silicon Valley Bank and applied them to Debtor's expenses on May 8, 2020, more than four months before Debtor filed its petition in bankruptcy. (Plotkin Dec., ¶ 4; Ex. 1 to Plotkin Dec.) No potential preference claim against PFG exists.

     **5.    PFG's Lien on the Proceeds of the PPP Loan Is Immune from Attack Pursuant to the Provisions of the Post-Petition Financing Order**

27. The hypothetical claims against PFG lack merit for yet another reason—neither the Trustee, nor Citibank, nor any other party objected to PFG's prepetition lien on the proceeds of the PPP loan in the deposit account within the sixty day Challenge Period permitted by the Final Order issued in connection with Debtor's post-petition financing from PFG. [D.I. 43.] Under

paragraph 14 of the Final Order,[3] the Trustee and other parties in interest were given until November 24, 2020 to challenge the validity of the Pre-Petition Liens and Pre-Petition Obligations, as those terms are defined in the Final Order. No challenge was timely made. Accordingly, PFG's senior perfected security interest in Debtor's assets, including the deposit account containing proceeds of the PPP loan from Citibank, cannot be challenged or otherwise attacked, yet that is precisely what the Objection attempts to do. Citibank challenges PFG's right to retain the portion of the PPP proceeds applied to Debtor's indebtedness, which is an attack on the validity of PFG's senior lien on the funds in Debtor's deposit accounts. While Citibank's theories of purported liability vary, at their core they represent arguments why PFG should be prevented from enforcing its lien rights on the deposit accounts. Such arguments are foreclosed by the Final Order because no party brought a Claim Objection within the Challenge Period. The Estate therefore would be barred from belatedly contesting the validity of PFG's lien on the loan proceeds in the deposit account and the propriety of PFG's actions in exercising its statutory and contractual remedies to its cash collateral. For this additional reason, the probability of success in any litigation against PFG is virtually non-existent.

28.    As the foregoing discussion makes clear, the prospect of any recovery against PFG is exceedingly slim because there simply are no facts to suggest that PFG did anything improper. Consideration of the first *Martin* factor alone compels rejection of the Objection and approval of the compromise and release.

---

[3] Paragraph 14 provides in relevant part: "If the Trustee or any other party in interest fails to bring a Claim Objection before the expiration of the Challenge Period, any and all Claim Objections shall be deemed to be forever waived, released and barred, and the Pre-Petition Obligations shall be deemed allowed as a secured claim within the meaning of section 506 of the Bankruptcy Code." It should be noted that the release that is the subject of the Motion is not rendered superfluous by expiration of the Challenge Period, since the release covers, among other things, matters arising after the Final Order.

### B. Likelihood of Collection Is Not Relevant

29. Citibank stresses the assumed health of PFG's financial condition to support application of the second *Martin* factor—the likelihood of collection of any judgment. While PFG does not contest the Estate's ability to collect a hypothetical judgment for the imagined wrongs for purposes of the Motion, that financial health is a double-edged sword. While the Objection cannot be sustained simply because PFG could pay a hypothetical judgment, the Court should take into account the fact that PFG does have the resources to vigorously contest what it views as the baseless charges Citibank has leveled—resources it intends to deploy.

### C. Litigation Would Be Complex and Expensive

30. Citibank gives short shrift to the third *Martin* factor—the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it. Citibank erroneously assumes that the litigation would be simple and straightforward.

31. Citibank identifies a plethora of potential claims it asserts could be leveled against PFG—aiding and abetting breach of fiduciary duty, aiding and abetting fraud, fraudulent transfer, receipt of preferential payments, tortious interference with contract, restitution for unjust enrichment, and other unidentified claims. The sheer number of potential claims guarantees costly and time-consuming litigation. Moreover, before the Estate could even attempt to prove up the aiding and abetting claims against PFG, it would have to prove that Mr. Kanodia committed fraud and/or breach of fiduciary duty, two notoriously difficult claims to establish. The Estate would need to fully investigate all facts and circumstances surrounding Mr. Kanodia's actions in applying for the PPP loan, which would then require an expansion into an examination of Debtor's entire business operations to establish that whatever information Mr. Kanodia provided about such

operations was intentionally misrepresented and did not support the loan received. Given that Mr. Kanodia is located in India, obtaining that discovery likely would be extremely expensive and may not even be possible.

32.     The Estate also would have to prove that PFG is responsible for Mr. Kanodia's conduct. Not only would the Estate have to develop evidence that PFG was involved in the loan application process—evidence that does not exist—but also that PFG knew of and participated in Mr. Kanodia's allegedly wrongful acts. The issues are complex, and the discovery to attempt to develop evidence will be expensive. Citibank leaves unanswered the obvious question as to how the Estate will be able to pay these substantial expenses.

33.     Further, the serious nature of these charges would require PFG to vigorously defend its reputation and obtain exoneration at trial. This is not a case that would result in a rapid and cost-effective settlement. As mentioned above, PFG has the resources to prove at trial that the charges Citibank levels are devoid of merit, and intends to fully deploy those resources. The third *Martin* factor weighs heavily in favor of approving the settlement and release.

### D.     **The Settlement Furthers the Interests of the Creditors**

34.     The final *Martin* factor is the paramount interest of the creditors. While Citibank argues that disapproval of the settlement is in the creditors' interests, it really means that disapproval would be in its best interests because it is looking to shift blame for its own negligence in making an ill-considered loan without conducting even minimal due diligence. Although Citibank now claims that Debtor may have fraudulently procured the loan because its business relied on foreign contractors, Citibank must have been aware of those facts when it made the loan, since Debtor maintained deposit accounts with Citibank that revealed material information concerning Debtor's business operations, including the presence of an employee base in India, rather than the United States.

35. Further, Citibank is not being singled out to bear the brunt of Debtor's failure, as Citibank's assertion that it is the largest unsecured creditor is demonstrably false. That dubious distinction belongs to PFG, which holds an unsecured claim many times the amount claimed by Citibank. PFG's losses far exceed those of Citibank, so any hypothetical recovery from PFG to the unsecured creditors would redound largely to PFG's benefit, making the litigation even less cost-efficient that it already would be.

36. Citibank's real complaint is that the estate lacks sufficient assets to satisfy its claims, and that the consideration received for the PFG settlement and release will be consumed by administrative expenses. But the interests of administrative creditors obviously also should be considered and not ignored in determining the overall fairness and reasonableness of the settlement. Moreover, PFG provided substantial funds—over $500,000 of post-petition financing—to assist in the administration of the Estate and enable the Trustee to attempt to maximize the proceeds of the sale of Debtor's assets.

37. Similarly lacking in merit is Citibank's argument that PFG unfairly asserted leverage over the Trustee to compel him to provide PFG with a release. No evidence supports such an assertion. The Trustee was in the unenviable position of administering an estate with no unencumbered assets. PFG was more than fair in relinquishing a portion of its collateral to support the Trustee's efforts, and should not be punished because Debtor lacked sufficient assets to satisfy Citibank's claim. The Trustee was able to negotiate PFG's payment of even more unencumbered cash for the Estate's benefit in return for a release of dubious value. The Trustee should be commended, not insulted.

## CONCLUSION

38. Given that there is no evidentiary basis for Citibank's assertion that PFG knowingly participated with Mr. Kanodia in his alleged wrongdoing in obtaining the PPP loan—wrongdoing

that Citibank also has failed to demonstrate—any recovery at all for the Estate is a windfall. The Trustee negotiated a settlement pursuant to which the Estate received the benefit of at least $80,000 in return for the release. The Trustee made an informed decision that the settlement was in the Estate's best interests, and Citibank has failed to demonstrate otherwise. Disapproval of that settlement now, and pursuit of imaginary claims against PFG that would only further deplete exceedingly scarce resources, is antithetical to the interests of the creditors. The Motion should be approved.[4]

WHEREFORE, PFG respectfully submits that the Motion should be granted because the Trustee has established that the proposed settlement and release is fair, reasonable and in the Estate's best interests, and Citibank's Objection fails to demonstrate that any hypothetical claim against PFG is worth pursuing.

Dated:  January 13, 2021
        Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Facsimile:    (302) 295-0199
Email:          chipman@chipmanbrown.com
                    olivere@chipmanbrown.com

Leo D. Plotkin
**LEVY, SMALL & LALLAS**
815 Moraga Drive
Los Angeles, California 90049
Telephone:  (310) 471-3000
Email:          lplotkin@lsl-la.com

*Counsel for Partners for Growth V, LP*

---

[4] Citibank belatedly complains that the asset sale did not yield more cash to the Estate with which the purported claims could be pursued. The time for Citibank to object to the sale has long since passed. Moreover, Citibank articulates no basis on which PFG—a substantially undersecured creditor that has lost millions of dollars on its own loan to Debtor—should be required to give up even more collateral than it has already contributed to the Estate.